## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLOMBIA

ANDREW QUENTIN TAAKE,

    Plaintiff,

    v.                            Civil Action No. 25-3029 (EGS)

UNITED STATES OF AMERICA, et al.,

    Defendants.

## PLAINTIFF TAAKE'S RESPONSE AND OPPOSITION TO THE UNITED STATES' COMBINED MOTION FOR PARTIAL DISMISSAL AND TRANSFER OF VENUE

Plaintiff Andrew Taake, by and through undersigned counsel, hereby responds to, and opposes, the government's motion for "partial dismissal" and transfer of venue to the Middle District of Pennsylvania.

For the reasons set forth below, the Motion should be denied.

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................. 5

II.    FACTUAL BACKGROUND ............................................................. 5

III.   LEGAL STANDARD......................................................................7

IV.   ARGUMENT,PART ONE.................................................................9

    A.  The United States Is Responsible For The Acts Or Omissions of the District of Columbia Metropolitan Police Department and MPD Officer Tate

because the United States summoned, enlisted, and drafted the MPD into its service on January 6, 2021 and thus the United States is responsible for the conduct of MPD officers in the United States' service.................................................................................10

    B. The United States' Claim that it "has not waived sovereign immunity for plaintiffs claims" Should be Denied as Frivolous.................................13

    C. Taake's Count I Claims are Not Claims involving Policy Decisions.........14

    D. Taake filed a proper timely SF-9 grievance which notified the United States of his grievances and exhausted administrative remedies.....................15

    E. The United States is responsible for the misconduct of Officer Tate under both §1983 and Bivens, to the very extent this mixture of state and federal law combined to injure Taake and deprive Taake of his constitutional rights........................................................................................17

V.  TAAKE'S COUNT II LAYS OUT A VALID BIVENS CLAIM INTERMIXED WITH A CLAIM OF §1983 STATE ACTION ........................................................19

    A. The Supreme Court has never ruled that Bivens is dead, overturned, disfavored, wrongly decided, or 'bad law.' Rather the Supreme Court has repeatedly extolled the virtues of Bivens.............................................21.

    B. Plaintiff's Eighth Amendment Claim Against BOP Director Peters Fits Squarely Within the Recognized Bivens Context of Carlson v. Green and Is Not a "New Context."....................................................................24

    C. The Complaint Adequately Identifies the Responsible Officials,............26

    D. The Claims Against Pam Bondi for Use of False Testimony at Sentencing State a Cognizable Constitutional Violation Supporting Bivens Relief (or, Alternatively, Survive Dismissal)..................................................27

    E. The BOP's Retaliatory Diesel Therapy Transfers of Taake to Other Facilities to Negate Taake's Medical Progress Constitutes an Unconstitutional Practice and Policy under Bivens/§1983..................36

    F. Neither Peters nor Bondi have Qualified Immunity Here, because Medical decisions are different than split-second police decisions, from which many qualified-immunity holdings stem...........................................39

ARGUMENT: PART TWO: TRANSFER TO THE MIDDLE DISTRICT OF PENNSYLVANIA IS NOT PROPER OR WARRANTED.....................................42

CONCLUSION...........................................................................................  49

CERTIFICATE OF SERVICE   ..........................................................  49

**THE TICKTIN LAW GROUP**
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (561) 232-2222

## TABLE OF AUTHORITIES

### Cases

Ali v. Rumsfeld, 649 F.3d 762, 767 n.3 (D.C. Cir. 2011) ................................. 18

also Coscia v. United States, 944 F. Supp. 2d 275 (S.D.N.Y. 2013) ............... 16

Atherton v. D.C. Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009)......... 8

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).................................. 5, 6

Bivens............................................................................................... 13

Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971 ............................................................................... 18, 19

Bivens, .............................................................................................. 17

Blakely v. United States, 276 F.3d 853 (6th Cir. 2002) .................................. 15

Dalehite v. United States, 346 U.S. 15 (1953) .............................................. 13

Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) ................................ 7

Gordon v. United States Capitol Police, 778 F.3d 158, 163-164 (D.C. Cir. 2015) .......................................................................................................... 5

Iqbal, .................................................................................. 6, 7, 8, 20, 25

Lewis v. Bayh, 577 F. Supp. 2d 47, 57 n.5 (D.D.C. 2008) ............................. 17

Michelle Bourdelais v. JP Morgan Chase Bank, N.A. ...................................... 6

Romero v. Peterson, 930 F.2d 1502 (1991) .................................................. 11

Texas v. Kleinert, 143 F. Supp. 3d 551 (W.D.Tx. 2015) ................................ 10

Tucker v. United States Postal Service, 676 F.2d 954 (3d Cir. 1982) .............. 16

United States v. Brown, 76 F.4th 1073 (8th Cir. 2023) .................................. 10

United States v. Gaubert, 499 U.S. 315 (1991) ............................................ 14

United States v. Luna, 649 F.3d 91 (1st Cir. 2011) ....................................... 11

United States v. Muniz, 374 U.S. 150 (1963) ............................................... 13

United States v. Nelson, 579 F. Supp. 3d 1251 (D.N.M. 2022) ....................... 10

United States v. Thomas, Case 1:21-cr-00552, (D.D.C. 2021); ....................... 12

United States v. Wren, Case 1:21-cr-00599-RBW (D.D.C. 2021) .................... 12

Williams v. United States, 396 F.3d 412, 414-15 (D.C. Cir. 2005 ................... 17

### Statutes

18 U.S.C. § 1114 .................................................................................. 12

18 U.S.C. §1114 ............................................................................... 11, 12

18 USC §111 .................................................................................... 11, 12

28 U.S.C. § 1346(b) ............................................................................... 13

28 U.S.C. § 2675(a) ............................................................................................. 15
28 U.S.C. § 2680(a) ............................................................................................. 14
42 U.S.C. §1983.............................................................................................. 17, 18
Civil Rights Act ................................................................................................... 13
Federal Tort Claims Act (FTCA) .............................................................. 13, 15
FTCA .................................................................................................................... 17

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................ 6, 7

## I.    INTRODUCTION

While incarcerated at various BOP facilities, Plaintiff Andrew Taake—who required testosterone replacement therapy for a documented medical condition—was deliberately injected by BOP medical staff with estrogen, a contraindicated hormone. This error caused severe physical and psychological injuries, including hormonal imbalance, pain, and other complications.

Due to these unlawful injections, Plaintiff Taake developed female characteristics including female breast tissue. This led to him being physically assaulted and battered three times while in the BOP system, causing further industries.

Director Colette Peters, as head of the BOP, is responsible for the medical care policies, oversight, training, and systemic failures that allowed this deliberate indifference to Plaintiff's serious medical needs.

Taake's prison horrors are also attributable to the conduct of the U.S. Justice Department, now under the direction of Pam Bondi.[1] During Plaintiff's federal sentencing hearing, the Department of Justice (under the Attorney General's authority and direction) presented false testimony from a law enforcement officer. That officer falsely claimed Plaintiff had injured him—an

---

[1] Note that as these words are being written there are news reports that Pam Bondi may be soon replaced as Attorney General.

allegation the same officer had previously and explicitly disavowed. This knowing presentation of untrue misleading testimony led to a materially enhanced sentence, violating Plaintiff's Fifth Amendment due process rights to a fair sentencing proceeding free of fabricated evidence.

## II.    LEGAL STANDARD

Qualified or absolute immunity and Bivens availability are often addressed at the motion-to-dismiss stage, but only where the complaint's allegations conclusively establish a bar; otherwise, factual development is required.

Despite intense excitement among the defense bar by the *Twombly* and *Iqbal* U.S. Supreme Court precedents, it still remains true that when reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the court must "accept the complaint's allegations as true and draw all reasonable inferences in favor of the non-moving party*." Gordon v. United States Capitol Police*, 778 F.3d 158, 163-164 (D.C. Cir. 2015).   A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests only the legal sufficiency of the complaint. Dismissal is improper unless the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted) (*quoting Bell*

*Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); accord *Conley v. Gibson,* 355 U.S. 41, 47 (1957)); *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (per curiam). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted). As such, a motion to dismiss at this stage must be decided solely on what Plaintiffs have plead in their complaint, taken as true, and not upon any factual "contradictions" that Defendants have attempted to insert. Involving such weighing of fact would take the standards of pleading to new heights not contemplated before by any Court.

The standard of review is well-summarized in *Michelle Bourdelais v. JP Morgan Chase Bank, N.A., and Chase Home Finance LLC,* Memorandum Opinion (denying Motion to Dismiss in part), civil action 3:10CV670, United States District Court for the Eastern District of Virginia, Richmond Division (November 5, 2012).

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint … [But I]t does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Marrtin,* 980 F.2d 943, 952 (4th Cir. 1992).  To survive Rule 12(b)(6) scrutiny, a complaint only need contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also,* Fed.R.Civ.P. 8(a)(2)("A pleading that states a claim for relief must contain

… a short and plain statement of the claim showing that the the pleader is entitled to relief.")

Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted for clarity).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556. *See also*, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193.

Many defendants in most lawsuits now routinely seek to stand on misleading contentions that a complaint is conclusory in its factual allegations. Although the U.S. Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) clarified the standard governing the sufficiency of the allegations of the most vague complaints, the U.S. Supreme Court did not order the cataclysmic dismantling of federal litigation that the defense bar would wish us to believe.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 127 S.Ct. 1955. ***The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.*** *Ibid.* ***Where a complaint pleads facts that are "merely consistent with" a defendant's liability,*** it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 127 S.Ct. 1955 (brackets omitted).

*Id. (emphases added).*

A "detailed factual allegation" is not necessary to withstand a Rule 12(b)(6) motion to dismiss. *Twombly,* 550 U.S. at 555-56. accord *Atherton v. D.C. Office of the Mayor,* 567 F.3d 672, 681 (D.C. Cir. 2009). A claim to relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1949. This amounts to a "two-pronged approach," under which a court first identifies the factual allegations entitled to an assumption of truth and then determines "whether they plausibly give rise to an entitlement to relief." Id. at 1950-51.

## III.  ARGUMENT PART ONE

**A. The United States Is Responsible For The Acts Or Omissions of the District of Columbia Metropolitan Police Department and MPD Officer Tate because the United States summoned, enlisted, and drafted the MPD into its service on January 6, 2021 and thus the United States is responsible for the conduct of MPD officers in the United States' service.**

The United States begins its argument by claiming "The United States Is Not Responsible For The Acts Or Omissions Of The District of Columbia Metropolitan Police Department Nor Metropolitan Police Officer Tate."

While this may be true in many or even most other contexts, it is **_not_** true with regard to the conduct of MPD officers at the U.S. Capitol on January 6, 2021.  MPD officers *were summoned by* the United States, and deployed by the United States pursuant to well-settled mutual aid agreements between the U.S. Capitol Police and the MPD.

Taake's complaint plainly states that

> 23. Officer Nathan Tate, Metropolitan Police Department, with headquarters at 441 4th Street, NW, 7th Floor, Washington, DC 20001, is a sworn law enforcement officer of the police force of the city of Washington, D.C. and *responded on orders* to the U.S. Capitol building and grounds on January 6, 2021, to engage in crowd control in a demonstration that then escalated (for which Plaintiff blames law enforcement officials, primarily the MPD) into attacks on demonstrator initiated unprovoked by law enforcement and this spawned any physical conflicts and confrontations.

> 24. On January 6, 2021, the MPD of Washington, D.C., *were agents of the U.S. Government under a pre-existing Memorandum of Understanding to assist the U.S. Capitol Police.*

Taake's Corrected Complaint, ECF 2-1, at 5 (emphasis added).

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (561) 232-2222

It is well settled that city police officers are considered "federal officers" when they are deputized or authorized to act on behalf of the federal government. For example, city police officers who are deputized as members of federal task forces or authorized to perform federal functions may be treated as federal officers. Courts have consistently held that such deputation establishes the officer's federal status. For example, in United States v. Brown, 76 F.4th 1073 (8th Cir. 2023), the court emphasized that "State and local officers authorized under 287(g) agreements to perform federal immigration enforcement functions are considered federal officers while acting under such agreements. These officers are treated as de facto federal agents."  See also *United States v. Nelson*, 579 F. Supp. 3d 1251 (D.N.M. 2022) (recognizing that state or local officers deputized by a federal agency are federal officials for some purposes; *Texas v. Kleinert*, 143 F. Supp. 3d 551 (W.D.Tx. 2015) (concluding that a local officer deputized to investigate federal crimes was acting as a federal officer and entitled to Supremacy Clause immunity).

State or municipal officers may also be deemed federal actors if they act jointly with, under the direction of, or on behalf of the federal government. *See Romero v. Peterson*, 930 F.2d 1502 (1991). Courts have repeatedly affirmed that local officers acting as part of federal task forces are federal officers. For example, in *United States v. Luna,* 649 F.3d 91 (1st Cir. 2011), the First Circuit

concluded that a deputized local officer participating in a federal task force qualified as a federal officer under 18 USC §111 and 18 U.S.C. §1114.

One could hardly imagine a more deputized federal officer than Nathan Tate on January 6, 2021. Tate was literally summoned by the United States, pursuant to a longstanding mutual agreement between the MPD and the federal government. Tate responded to the United States Capitol, where Tate proceeded to <u>work at the U.S Capitol</u> to <u>protect the U.S. Capitol</u>. Afterward, Tate cooperated with U.S. federal prosecutors to identify, gather and provide evidence for the United States government. Tate worked with the federal Justice Department to prosecute, falsely testify against, and wrongly imprison Taake.

Indeed Taake was federally indicted under 18 U.S.C. 111 for "assaulting, resisting, opposing, impeding, intimidating, or interfering with" Officer Tate who was designated under section 1114 as a *federal* officer. 18 U.S.C. § 1114 (titled "Protection of officers and employees of the United States") defines federal officers as "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance . . ."

It is noteworthy that this issue (of whether M.P.D. officers were "federal officers" at the U.S. Capitol on January 6) was litigated extensively in January 6 prosecutions. And in every case, the courts ruled that the Metro officers were federal officers under 18 U.S. Code § 1114. See, e.g., *United States v. Thomas,* Case 1:21-cr-00552, (D.D.C. 2021); *United States v. Wren,* Case 1:21-cr-00599-RBW (D.D.C. 2021).

Imagine how preposterous the law would be if citizens could be accused, prosecuted and imprisoned for "assaulting federal officers" who were commissioned and paid as local city officers, but the same officers were immune from liability in federal civil suits because the officers were local city officers.

### B. The United States' Claim that it "has not waived sovereign immunity for plaintiffs claims" Should be Denied as Frivolous.

In the tradition of countless motions to dismiss by the United States D.O.J., the United States offers the claim that the United States "has not waived sovereign immunity." The Federal Tort Claims Act (FTCA), the Civil Rights Act, and the Bivens line of cases represent clear waivers of federal sovereign immunity or judicially recognized exceptions to federal sovereign immunity for Taaki's tort and constitutional claims.

The FTCA, enacted in 1946, allows private individuals to sue the United States for money damages arising from torts committed by federal employees acting within the scope of their employment. This waiver is codified in 28 U.S.C. § 1346(b), which grants federal district courts exclusive jurisdiction over such claims, and 28 U.S.C. § 2674, which makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances."

The FTCA's waiver applies to negligent or wrongful acts or omissions by federal employees, mirroring state tort law where the act occurred. For example, claims for personal injury, property damage, or wrongful death caused by federal negligence are permissible, provided they would be actionable against a private party under similar circumstances. See *United States v. Muniz,* 374 U.S. 150 (1963), where the Supreme Court upheld FTCA liability for negligent medical care in federal facilities, and *Dalehite v. United States,* 346 U.S. 15 (1953), which clarified exceptions.

**C. Taake's Count I Claims are Not Claims involving Policy Decisions.**

While there is overlap between the FTCA and Bivens/§1983, there are stark differences. Under the FTCA there is a "discretionary function exception" which bars claims based on policy decisions or discretionary acts, even if negligent. 28 U.S.C. § 2680(a); *United States v. Gaubert,* 499 U.S. 315 (1991). But the acts described in Taake's Count I are hardly policy decisions or

discretionary acts. Taake accused the United States of staging periodic shakedowns of Taake's prison cells—where BOP staff removed and destroyed Taake's medical and legal files to cover up medical malpractice. (¶114), (¶117), falsely diagnosing (¶120), ignoring prior diagnosis (¶134) and lying about the misdiagnosis (¶121, ¶122), injecting or allowing to be injected estrogen into Taake when Taake needed testosterone. (¶132), delaying and denying necessary medical treatment (¶136), providing incorrect and inadequate treatment (both wrong medication (estrogen) and wrong dosage) (¶139), ignoring Taake's complaints of pain and symptoms (¶140), giving estrogen injections instead of testosterone (¶144), compounding refusal to test, treat, and delay by filing false, perjurous and contemptuous statements with the Court falsely claiming Taake had abused steroids (¶156), fabricating testimony, (¶157), assaulting and battering Taake (¶158), ignoring and refusing to examine Taake upon Taake's contracting tuberculosis (¶166), shuffling Taake among a dozen prisons while Taake awaited trial (¶167), consistently and regularly transferring Taake to different prisons just before medical treatment progress could occur (¶168).

**D. Taake filed a proper timely SF-9 grievance which notified the United States of his grievances and exhausted administrative remedies.**

Contrary to the government's arguments, Taake exhausted administrative remedies.  Under the Federal Tort Claims Act (FTCA), 28 U.S.C.

§ 2675(a), plaintiffs must first present an administrative claim (typically via Standard Form 95 or SF-95) to the relevant federal agency before filing suit in federal court. The SF-95 must provide sufficient notice of the underlying facts to enable the agencies to investigate and potentially settle the claim. However, courts have consistently held that the administrative claim need not articulate every possible legal theory or ancillary claim arising from the same set of operative facts. Instead, the focus is on whether the additional matter in the complaint is a "substantial variance" from the administrative claim or whether it is sufficiently related to the described incident, allowing the agency to reasonably anticipate it.

Courts apply a liberal construction to SF-95s to avoid technical defeats, particularly for pro se claimants, and particularly for pro se claimants who are imprisoned at the time of filing their SF-95s. See, e.g., *Blakely v. United States,* 276 F.3d 853 (6th Cir. 2002) (allowed a surviving spouse's loss of consortium claim in the complaint, even though it was not mentioned in the SF-95)

Taake's *pro se* handwritten SF-95—written while Taake was incarcerated and suffering from the severe health condition brought on by the United States' misconduct—gave the United States notice of the essential facts of his ordeal. Under FTCA, exhaustion is a claims-processing rule, not jurisdictional, allowing flexibility for related matters. See Blakely, supra (holding that the SF-95 provided adequate notice to investigate the incident. The Blakely Court

emphasized that FTCA exhaustion requires notice of facts, not every derivative claim, to avoid "jurisdictional traps" for plaintiffs). *Tucker v. United States Postal Service*, 676 F.2d 954 (3d Cir. 1982) (allowing recovery for personal injuries from a vehicle accident despite the SF-95 not including itemized medical bills or specific damage details). *See also Coscia v. United States*, 944 F. Supp. 2d 275 (S.D.N.Y. 2013) (permitting additional medical malpractice claims (e.g., failure to diagnose) in the complaint that were implied in the SF-95, which focused on surgical error because all claims arose from the same treatment episode).

Taake's form provided sufficient factual notice of Taake's incidents. The FTCA should not be defeated by hypertechnical readings of the administrative claim, especially when the related damages stem from the same event.

### E. The United States is responsible for the misconduct of Officer Tate under both §1983 and Bivens, to the very extent this mixture of state and federal law combined to injure Taake and deprive Taake of his constitutional rights.

42 U.S.C. §1983 applies to conduct done under color of state law. *Bivens* applies to conduct done under color of federal law. The precise proportion or mix of federal/state responsibility in this matter is a question of fact for the jury and court to decide. Officer Nathan Tate, a member of the Metropolitan Police Department, was paid, commissioned, and salaried under state law.  And on January 6, Tate was summoned into the service of federal

law when Tate responded to orders to be at the U.S. Capitol.  And when Officer Tate fabricated evidence and testimony against Taake at Taake's sentencing hearing, the Officer was under the supervision of Pam Bondi and the Bondi Department of Justice.

**There is considerable overlap between the coverage of FTCA, Bivens, and Section 1983.**

When federal officers act together or conspire with state officials to deprive an individual of his constitutional rights, they may be considered to have acted under color of state law for § 1983 purposes. See W*illiams v. United States*, 396 F.3d 412, 414-15 (D.C. Cir. 2005); *Lewis v. Bayh,* 577 F. Supp. 2d 47, 57 n.5 (D.D.C. 2008) ("Although the defendant is a federal official and § 1983 ostensibly applies to state officials, even federal officials may be liable under § 1983 provided they acted in concert with state officials.").

As described in Taake's corrected complaint, Taake was subjected to misconduct by both state and federal actors. As Taake painstakingly described, "while Taake was on the upper terrace of the U.S. Capitol, an unknown Metropolitan Police Department officer, John Doe 1, stomped on Taake's hand causing disfigurement." (¶4). 68. At most prisons, Taake was placed in solitary confinement as punishment. Taake suffered three prison attacks when fellow

prisoners came into his cell and attacked him. His hand was broken more severely due to fights over breast growth. (¶68).

A *Bivens* suit is "the federal counterpart of a claim brought pursuant to 42 U.S.C. § 1983." *Ali v. Rumsfeld*, 649 F.3d 762, 767 n.3 (D.C. Cir. 2011) (citation omitted). "This lawsuit, brought under the Civil Rights Act 42 U.S.C. §1983, the Bivens line of cases, and the FTCA, seeks money damages for the violations of the rights of the Plaintiff under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution as well as common law claims for medical malpractice, negligence, negligence per se, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress." Taake's corrected complaint, ECF 2-1, at 7.

### III. Taake's Count II Lays Out a Valid *Bivens* Claim intermixed with a claim of §1983 state action.

Additionally, Plaintiff Andrew Taake respectfully opposes Defendants' Motion regarding his Bivens/§1983 claims (Count II). The Complaint states viable claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), and related constitutional theories. Defendants' arguments—that *Bivens* does not apply to Plaintiff's claims and that Plaintiff failed to name the specific BOP medical provider who administered the contraindicated estrogen injection—lack merit and should be rejected. In the alternative, and to the extent any pleading deficiency exists regarding the identity of the line-level medical provider, Plaintiff requests leave to amend the

Complaint once that individual's identity is ascertained through discovery or BOP records.

Taake's injuries were a mixed creation of government actors under color of both federal law and state law.  As such, Taake's Count II properly invokes both sources of law in its introduction (¶183-84) (42 U.S.C. § 1983: "Every person, who under color of [state law] or the District of Columbia subjects or causes to be subjected any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .;  "Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971) (providing the same protection regarding unconstitutional conduct by officials acting under color of federal law).

Yet the defendant government seems to argue that Taake must make a "stand-alone Bivens claim." Counsel for Taake know of no case law suggesting such a requirement.

**A. The Supreme Court has never ruled that *Bivens* is dead, overturned, disfavored, wrongly decided, or 'bad law.'  Rather the Supreme Court has repeatedly extolled the virtues of *Bivens*.**

Next the defendant United States paints a truly grim picture of federal constitutional remedies; even suggesting that *Bivens* is dead or on the verge of being overturned and that federal officials can violate almost any American's rights without fear of civil judgment under *Bivens*. The government claims that "the Supreme Court has recognized a *Bivens* claim in only three circumstances." citing *Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022): (1) excessive force by federal officers in violation of the Fourth Amendment, (Bivens itself), (2) gender discrimination by congressional staffers (*Davis v. Passman*, 442 U.S. 228 (1979)), and (3) inadequate medical care to federal prisoners in violation of the Eighth Amendment (citing *Carlson v. Green*, 446 U.S. 14 (1980)). Other than these three precise scenarios, every *Bivens* claim should be quickly dismissed, according to the government's motion.

But contrary to the arguments of the government, the Supreme Court has never ruled that *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotic*s, 403 U.S. 388 (1971) was wrongly decided, overturned or disfavored. At most, the Court has at times expressed such thoughts in dicta or expressed reluctance to extend the *Bivens* doctrine to expansive new contexts or categories. This is the context behind the government's anti-Bivens quotes. *Egbert v. Boule*, 596 U.S. 482 (2022), *Ziglar v. Abbasi*, 582 U.S. 120 (2017), Ashcroft v. Iqbal, 556 U.S. 662 (2009), *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001).

In *Egbert v. Boule,* 596 U.S. 482 (2022). the Court simply said that Congress is the preferred lawmaker under the Constitution and that courts should never presume to invent new causes of action in ways that intrude on Congress' litigation powers. Similarly, in *Ziglar v. Abbasi,* 582 U.S. 120 (2017). the Court reiterated that expanding *Bivens* is disfavored to the extent that Congress would determine so.

In fact, Supreme Court majorities have written positively about *Bivens* and extolled the case's virtues in several opinions—in recent years. In *Ziglar v. Abbasi,* 582 U.S. 120 (2017) the Court acknowledged the importance of *Bivens* in vindicating constitutional rights. The Court further emphasized that the "settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." In *Davis v. Passman,* 442 U.S. 228 (1979), the Court highlighted the remedial nature of *Bivens,* stating that "if petitioner is able to prevail on the merits, she should be able to redress her injury in damages, a 'remedial mechanism normally available in the federal courts'." *See also Hernandez v. Mesa,* 589 U.S. ___ (2020) (Ginsberg, J., dissenting) ("While reining in this Court's *Bivens* jurisprudence, the Court cautioned in *Abbasi* that its "opinion is not intended to cast doubt on the continued force, or even the necessity, of Bivens in the search-and-seizure context in which it arose."

582 U. S., at ___ (slip op., at 11). Justice Ginsberg wrote that Bivens is a "a fixed principle in the law, are powerful reasons to retain it in that sphere." Ibid.

In *Carlson v. Green*, 446 U.S. 14 (1980), the Court recognized the complementary role of Bivens actions alongside statutory remedies. It noted that "Congress views FTCA and *Bivens* as <u>parallel, complementary</u> causes of action" and that the federal courts' jurisdiction to decide federal questions includes the power to award damages for constitutional violations <u>unless Congress explicitly forecloses such remedies.</u>

**Has <u>Congress</u> ever disparaged *Bivens*?**

This begs the question: has *Congress ever* disparaged *Bivens*?  Or suggested *Bivens* was wrongly decided? Has Congress indicated that *Bivens* is disfavored, or 'bad law.'? Not hardly.

Undersigned counsel knows of no instance where even a single U.S. representative or senator (out of many hundreds since *Bivens* was decided in the 1970s) has expressed the view that the Supreme Court overstepped its authority by enacting the *Bivens*.  In *Carlson v. Green*, 446 U.S. 14 (1980) the Supreme Court emphasized that Congress, when amending the FTCA in 1974, intended for the FTCA and *Bivens* to coexist as "parallel, complementary causes of action." *See also Bush v. Lucas*, 462 U.S. 367 (1983); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001). The legislative history of the FTCA

amendments made it "crystal clear" that Congress did not intend the FTCA to preempt or replace *Bivens* claims.

On the contrary, it is easy to find expressions by members of Congress *indicating frustration that the federal courts have limited the scope of Bivens.* For example on December 15, 2025 (Bill of Rights Day) U.S. Senator Alex Padilla (D-CA), joined by other senators, complained that for many aggrieved Americans, "[t]he only available remedy--the *Bivens* doctrine--has been sharply limited by the U.S. Supreme Court." Link to Congressional Record: https://www.govinfo.gov/content/pkg/CREC-2025-12-15/html/CREC-2025-12-15-pt1-PgS8731-2.htm. And while Congress has considered bills to expand the scope and reach of *Bivens*, it appears Congress has never entertained a bill to overturn *Bivens*.

### B. Plaintiff's Eighth Amendment Claim Against BOP Director Peters Fits Squarely Within the Recognized Bivens Context of *Carlson v. Green* and Is Not a "New Context."

The Supreme Court has expressly recognized a *Bivens* damages remedy for Eighth Amendment deliberate indifference to a federal prisoner's serious medical needs. *Carlson v. Green*, 446 U.S. 14 (1980). In *Carlson,* the estate of a federal prisoner sued BOP officials for administering contraindicated drugs, delaying proper care, and failing to transfer the inmate for emergency treatment—conduct that led to death. The Court held that such claims arise

directly under the Eighth Amendment and support an implied damages action against the responsible federal officers. Plaintiff's medical claim is materially indistinguishable.

BOP medical staff, under the authority and oversight of Director Peters, deliberately administered the wrong hormone (estrogen instead of required testosterone), causing serious injury. This is the precise type of "constitutionally inadequate medical care in a federal prison" that *Carlson* addressed: deliberate indifference by federal prison officials to a prisoner's known serious medical needs through the provision of contraindicated treatment. *See id.* at 16 n.1, 18–23. Defendants' assertion that *Bivens* "does not apply" ignores Carlson and the post-*Egbert* framework. *Egbert v. Boule*, 596 U.S. 482 (2022), and its progeny prohibit extension of Bivens to new contexts. But where a claim falls within one of the three established contexts (*Bivens*, *Davis v. Passman*, or *Carlson*), no "extension" is needed and the claim proceeds. *See Ziglar v. Abbasi*, 582 U.S. 120, 138 (2017) (explicitly preserving *Carlson*'s Eighth Amendment medical-indifference context). Recent circuit decisions confirm that claims involving BOP officials' deliberate indifference to medical needs—particularly the administration of wrong or inadequate treatment—remain viable under *Carlson* when the allegations track the core facts of inadequate prison medical care.

Even if any minor factual variance existed (none does here), the D.C. Circuit has not adopted the overly restrictive view urged by Defendants, and the Supreme Court has never overruled *Carlson*. The BOP Administrative Remedy Program (ARP) does not defeat the claim because, when the context is the same as Carlson, courts do not reach the "special factors" inquiry. *See Carlson,* 446 U.S. at 18–20 (rejecting alternative-remedy arguments).

**Director Peters is a proper defendant**.

The Complaint alleges her personal involvement through her policymaking authority over BOP medical care, training, and oversight of facilities where such egregious errors occurred. At the pleading stage, these allegations suffice. *See Iqbal,* 556 U.S. at 676 (supervisory liability requires personal involvement, but policy-level deliberate indifference satisfies that standard). If Defendants contend the line-level provider is the more direct actor, that does not warrant dismissal.

## C. The Complaint Adequately Identifies the Responsible Officials, or in the Alternative, Plaintiff Should Be Granted Leave to Amend to Name the Specific Medical Provider

Defendants' second ground—that Plaintiff 'failed to properly name Dr. Edinger as a defendant"—misunderstands both the allegations and procedural reality. The Complaint names Director Peters because she bears ultimate responsibility for BOP's systemic medical failures and policies that permitted the erroneous injection. BOP medical staff act under her direction. Plaintiff was

not in a position to know the precise identity of the individual injector at the time of filing, as such information is controlled by Defendants and typically requires discovery, BOP records, or a Rule 26(f) conference.

Federal pleading standards do not require naming every subordinate actor when supervisory or policy-level liability is alleged. Moreover, Bivens claims routinely proceed against high-level officials for systemic constitutional violations in prisons. If the Court believes the line-level provider must be added for full relief, Plaintiff respectfully requests leave to amend under Fed. R. Civ. P. 15(a)(2). Amendment would cause no prejudice, would promote judicial economy, and is freely granted "when justice so requires." Discovery will promptly reveal the identity of the specific medical provider. Dismissal on this technical ground would be premature and contrary to the liberal amendment policy of the Federal Rules.

### D. The Claims Against Pam Bondi for Use of False Testimony at Sentencing State a Cognizable Constitutional Violation Supporting Bivens Relief (or, Alternatively, Survive Dismissal)

The Complaint also pleads a viable Fifth Amendment due process claim against Attorney General Bondi arising from the DOJ's knowing presentation of false testimony at Plaintiff's sentencing. A law enforcement officer testified falsely that Plaintiff injured him—directly contradicting the officer's prior statements—resulting in an enhanced sentence. This constitutes a classic

deprivation of the right to a fair sentencing proceeding untainted by fabricated evidence.

This claim arises in a context closely analogous to recognized *Bivens* protections for due process violations involving government fabrication of evidence or knowing use of perjured testimony. Absolute prosecutorial immunity does not bar the claim here because the allegations involve supervisory/policy-level direction from the Attorney General's office and the presentation of known false evidence outside the core advocacy functions protected by *Imbler v. Pachtman,* 424 U.S. 409 (1976). Even where immunity might apply to line prosecutors, it does not automatically shield high-level officials for systemic or supervisory misconduct.

Qualified immunity likewise does not apply at this stage because the right to be free from the knowing use of false testimony to enhance a federal sentence has long been clearly established. Defendants' blanket assertion that "Bivens doesn't apply" fails for the same reasons outlined above: the claim does not require an impermissible extension beyond established constitutional-damages jurisprudence protecting the integrity of judicial proceedings. The Motion should be denied as to these claims.

Taake's complaint regarding Officer Tate and the Attorney General tracks well-established paths for recovery under §1983 and *Bivens*—the federal

corollary of §1983. During Taake's sentencing hearing on June 5, 2024, MPD

Officer Tate, acting under color of state law, fabricated evidence (likely at the

behest of the U.S. Justice Department) by lying about Tate's actions and

misrepresented facts in a "victim impact statement." Federal prosecutors acting

under the Attorney General, knew, condoned, and approved this false

testimony. This resulted in a harsher sentence and longer incarceration, and

loss of liberty.

This conduct violated well-established constitutional principles. See, e.g.,

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) (§1983 liability for fabricating

evidence); *Costanich v. Dept of Soc. And Health Srvcs*, 627 F.3d 1101 (9th Cir.

2010) (official who deliberately mischaracterizes witness statements in an

investigative report . . . commits a constitutional violation"); *Devereaux v.*

*Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) ("[T]here is a clearly established

constitutional due process right not to be subjected to criminal charges on the

basis of false evidence that was deliberately fabricated by the government.");

Stouffer v. Trammell, 738 F.3d 1205 (10th Cir. 2013) (saying the Eighth and

Fourteenth Amendments limit the use of highly prejudicial victim impact

statements).

In *Napue v. Illinois*, the Supreme Court held that a conviction or sentence

obtained through the use of false evidence, known to be such by the

prosecution, violates due process. Relief may be granted if the prosecution

knowingly allowed false testimony to go uncorrected, provided the testimony

was material to the outcome. This principle applies to victim impact statements

if the false testimony could have influenced the sentencing decision.

Misleading or materially false statements, even if unsworn or not

technically perjurious, can violate due process if they significantly impact a

verdict or sentencing decision. *See United States v. Bagley*, 473 U.S. 667, 684,

105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985) ("technically correct" but

misleading information provided by prosecution); *United States v. Polizzi*, 801 F.2d 1543, 1550 (9th Cir. 1986) (truthfulness of witness's ambiguous testimony matter of "unanswerable semantics"); *United States v. Iverson*, 637 F.2d 799, 805 n. 19 (D.C. Cir. 1980), modified, 648 F.2d 737 (1981) ("it makes no difference whether the testimony is technically perjurious or merely misleading"); *United States v. Bigeleisen*, 625 F.2d 203, 208 (8th Cir. 1980) ("misleading argument"); *United States v. Barham*, 595 F.2d 231, 243 n. 17 (5th Cir. 1979) ("misleading" answers reinforced by prosecutor); United States v. McClintic, 570 F.2d 685, 692 (8th Cir. 1978) (failure of government to correct "misleading impression" regarding witness' pending charges); *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) (prosecutor allowed "jury to be presented with a materially false impression"); *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978) (witness paraded himself in "false colors"); *Boone v. Paderick*, 541 F.2d 447, 450 (4th Cir. 1976), cert. denied, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977) (testimony which "skirts the edge of

perjury"); *Armour v. Salisbury*, 492 F.2d 1032, 1037 (6th Cir. 1974)

("misleading information"); *Levin v. Katzenbach*, 363 F.2d 287, 290 (D.C. Cir.

1966) (presenting "false picture" of the facts); *Scott v. Foltz*, 612 F. Supp. 50, 57

(E.D.Mich.1985) (jury "clearly misled" concerning witness' plea agreement);

United States v. Stifel, 594 F. Supp. 1525, 1539 (N.D.Ohio 1984) ("materially

misleading" testimony); United States ex rel. Dowd v. Lane, 574 F. Supp. 972,

974-75 (N.D.Ill. 1983), aff'd, 762 F.2d 1015 (7th Cir. 1985) (failure of

prosecutor to correct testimony he knew was "likely to convey a false

impression to the jury" and "deliberately emphasized the testimony by

repeating it").

Taake arrived at his sentencing hearing expecting to hear federal

prosecutors summarize the evidence the same way they had done so

previously. But instead, prosecutors under the direction of the Attorney

General, presented fabricated evidence in the form of a "victim impact

statement" wherein an officer acting under color of state law falsely claimed to have been injured by Taake.

The conduct of the United States and Collette Peters while Taake was imprisoned similarly violated well-established principles of constitutional law. The Eighth Amendment prohibition on cruel and unusual punishments extends beyond physically barbarous punishments and reaches conditions of confinement as part of the punishment subject to Eighth Amendment scrutiny. Wilson v. Seiter, 501 U.S. 294 (1991).

Deliberate indifference to serious medical needs of prisoners can constitute the unnecessary and wanton infliction of pain prohibited by the Eighth Amendment, including indifference by prison doctors in responding to needs or by prison guards in intentionally denying or delaying access to medical care. Bernier v. Allen, 38 F.4th 1145.

Deliberate indifference has both objective and subjective components; the official must be aware of facts from which an inference of substantial risk of serious harm could be drawn, and must actually draw that inference. Bernier v. Allen, 38 F.4th 1145.

Then, while incarcerated in the federal prison system, Taake was deceptively and unlawfully injected with wrongful treatments. Defendants knew or should have known of plaintiff's serious medical condition but failed to provide adequate care, proximately causing plaintiff's injuries. The estrogen injections wrongly given by Edinger and Peters caused Taake to develop gynecomastia. Taake suffered physical harm, emotional distress, and permanent disability or exacerbated hormonal imbalance and resulting condition due to defendant Edinger's actions (in wrongly diagnosing, treating and injecting Taake) and inaction (failure to perform required blood testing, neglect, failure to treat, failure to diagnose).

Taake was literally injected deceptively, against his will, with estrogen hormones when he needed testosterone. This caused Taake to develop female breast tissue and to then be brutally assaulted and battered within the prison system.

Taake spent years in prison over what should have been a misdemeanor disorderly conduct charge (if anything). He was finally released in a broken, sterile, deteriorated state, with continuing chronic, lifetime injuries.

**Collette Peters and Pam Bondi are responsible officials, named as defendants in their official capacities, so Taake has no need to "serve" them in their individual capacities.**

The government argues that "vicarious liability is inapplicable to *Bivens*," and that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (citations omitted))Taake's complaint plainly lays out institutional liability for the injuries claimed by Taaki under the guidance of the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The Supreme Court in *Monell* held that officials who wrongly train or supervise municipal officers can be liable under § 1983 for official policies or customs

causing violations.  Taake's complaint underlined in bold lettering that Taake alleged **"Respondeat Superior Liability As To All Counts."** (¶105).

### E. The BOP's Retaliatory Diesel Therapy Transfers of Taake to Other Facilities to Negate Taake's Medical Progress Constitutes an Unconstitutional Practice and Policy under Bivens/§1983.

Similarly, Taake's claims against Colette S. Peters in her official capacity as Director of the Federal Bureau of Prisons are valid Bivens claims. While the conduct of BOP officials in retaliatory transfers of Taake in order to void Taake's complaints and hamper Taake's medical progress are valid claims under FTCA, the policy of allowing, fostering, and imposing such a practice on the BOP system-wide is a plain *Bivens/Monell* claim. Taake's complaint states at ¶168 that in a pattern consistently observed in similar cases of January 6 defendants, the BOP "consistently and regularly transferred Taake to a different prison just before Taake could make progress regarding his medical needs.

This is plainly an unconstitutional practice of which the director of the B.O.P. is responsible and only *Bivens* can address. Congress could never have anticipated such an institution-wide abuse of transfers and seizures. Nor could Congress easily fashion a remedy or fix for such conduct.

## Retaliatory and Evasive "Diesel Therapy" Claims are Well Established Civil Rights Claims.

Taake's claims plainly allege both Eighth Amendment deliberate-indifference violations and First and Fifth Amendment (access to courts) violations, where liability of prison officials is widely recognized. See, e.g., *Bernier v. Allen*, 38 F.4th 1145, 1151-52 (D.C. Cir. 2022): "We assume without deciding that well-pleaded allegations that a treatment decision was based exclusively on nonmedical considerations such as cost or administrative convenience rather than any medical justification can suffice to state an Eighth Amendment deliberate indifference claim. We have not directly spoken to this question, but other courts appear to agree at least that cost or other nonmedical rationale cannot be the only justification for prison officials' treatment decisions." Id.

Taake's complaint described both his (1) serious medical need (objective component) and (2) the institutions' subjective awareness and reckless disregard for Taake's medical needs and constitutional rights. Responsible officials were aware of facts indicating a substantial risk of serious harm and still denied or delayed care through the transfer practice. Bernier v. Allen, supra. These failures were not inadvertent failures, bureaucratic error, or negligence in arranging care during transfers.

**Solitary Confinement, Exposure to Battery, and Exposure to an Unreasonable Risk of Serious Harm are Well Recognized Constitutional Claims.**

Exposure to conditions posing an unreasonable risk of serious damage to future health, or to an unreasonably high level of a harmful condition and a risk so grave that it violates contemporary standards of decency, constitutes deliberate indifference. *See Scott v. D.C.*, 139 F.3d 940 (D.C. Cir. 1998) (exposure to constant cigarette smoke). For Taake, being deceptively and involuntarily injected with estrogen, exposure to assaults and batteries, and exposure to tuberculosis without treatment were obvious Eighth Amendment conditions-of-confinement violations.  And the retaliatory "diesel therapy" transportations to different prisons to hinder Taake's medical progress and void Taake's grievances were First and Fifth Amendment violations of Taake's constitutional right to access the courts as well as Eighth Amendment violations.

F. **Neither Peters nor Bondi have Qualified Immunity Here, because Medical decisions are different than split-second police decisions, from which many qualified-immunity holdings stem.**

Arguments about qualified immunity often arise in the context of split-second police crime-scene decisions, where officers should be given great deference for spur-of-the moment failings or mistakes. But medical decisions are more likely to be made under calm conditions where officials have more

time to think and calculate. For this reason, medical decisions should not be given the same benefit of the doubt as decisions by police.

Accordingly, the purpose of qualified immunity to provide leeway for swift law enforcement action do not exist at the same level for institutional medical providers compared to law enforcement authorities. And certainly, medical providers are more likely to have prior notice that certain actions are prohibited.

In Taake's case, the defendants had to have been well aware that what they were doing was wrong and that it violated Taake's constitutional and civil rights.

**ARGUMENT: PART TWO: TRANSFER TO THE MIDDLE DISTRICT OF PENNSYLVANIA IS NOT PROPER OR WARRANTED.**

The core events giving rise to Plaintiff's claims occurred within the District of Columbia. The defendants United States, Pam Bondi and Collette Peters, are residents or headquartered in the District of Columbia.  The agencies involved are all headquartered in the District of Columbia, where most of the files, evidence and paperwork involved in this case are found in the District of Columbia. Yet Defendant seeks to transfer venue to the Middle District of Pennsylvania solely on the basis that Plaintiff alleges medical neglect and injury during his incarceration at the United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg"). However, this ancillary aspect of the complaint does not outweigh the substantial nexus of the primary claims to this District.

Transfer under 28 U.S.C. § 1404(a) is unwarranted, as it would not serve the convenience of the parties or witnesses, nor the interests of justice.

I.    BACKGROUND

Plaintiff's complaint alleges violations of his constitutional rights stemming from events in the District of Columbia. Specifically, Plaintiff asserts that a District of Columbia Metro Police officer, Nathan Tate, made false statements and engaged in misconduct that resulted in Plaintiff's arrest, prosecution, and imprisonment. These actions constitute the "heart" of the complaint, involving due process violations under the Fifth Amendment and other claims directly

tied to conduct in this jurisdiction. While Plaintiff also alleges medical neglect and deliberate indifference to his serious medical needs during his time at USP Lewisburg in Pennsylvania—claims potentially arising under the Eighth Amendment—these allegations are consequential to the primary wrongdoing in the District of Columbia.

The imprisonment itself was a direct result of the D.C.-based violations, and the medical claims do not predominate or shift the locus of the case. Defendant's motion argues that venue in the Middle District of Pennsylvania is appropriate due to the location of the alleged medical neglect. However, this ignores the foundational nature of the D.C. events and misapplies the standards for venue transfer.

## II.    LEGAL STANDARD

Venue in federal district courts is governed by 28 U.S.C. § 1391(e) for actions against the United States, which permits suit in any judicial district where a substantial part of the events or omissions giving rise to the claim occurred. Here, venue is proper in the District of Columbia under § 1391(e), as a substantial part—and indeed, the initiating events—of the claims occurred here. A transfer of venue is discretionary and may be granted under 28 U.S.C. § 1404(a) "[f]or the convenience of parties and witnesses, in the interest of justice," to another district where the action might have been brought. The

moving party bears the burden of establishing that transfer is warranted. See Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996).

Courts consider private interest factors (e.g., plaintiff's choice of forum, defendant's choice, where the claim arose, convenience of parties and witnesses, ease of access to proof) and public interest factors (e.g., transferee court's familiarity with the law, relative congestion of courts, local interest in deciding local controversies). See id.; see also Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29-30 (1988). Plaintiff's choice of forum is entitled to substantial deference, particularly where, as here, the forum has a strong connection to the events. See Gross v. Owen, 221 F.2d 94, 95 (D.C. Cir. 1955). Transfer should not be granted merely to shift inconvenience from one party to another.

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Transfer Venue and retain this case in the District of Columbia.

**The Claims Arose Primarily in the District of Columbia, Supporting Retention of Venue Here.**

Contrary to the defendant's assertions, Taake's horrendous story of injuries involves <u>several</u> locations.  Taake's complaint, at paragraph 10, states, "While still incarcerated, last in Houston, Texas, prior to being pardoned, Taake filed Administrative Claim No. TRT-NER-2024-08359 on August 22, 2024. Paragraph 1 states "This Court has jurisdiction in that Taake is a citizen of the

State of Texas and his suit is against agencies of the federal government of the

United States." None of the parties are residents of the Middle District of

Pennsylvania or anywhere else in Pennsylvania. In fact, with the exception of

Taake himself, all parties are residents of the District of Columbia or its

surroundings:

> 13. The Defendant, United States of America, is represented by the United States Attorney's Office for the District of Columbia, located at 950 Pennsylvania Avenue, N.W. Washington D.C. 20530. 14. The Defendant, Colette S. Peters as the Director of the Federal Bureau of Prisons, located at 320 1st Street NW, Washington D.C. 20534. 15. The Defendant, Pam Bondi Attorney General as the Head of the U.S. Department of Justice and Successor to Merrick Garland, located at 950 Pennsylvania Avenue NW, Washington D.C. 20530.

Taake's complaint, ECF 2-1, at 4.

Taake then laid out the jurisdiction and venue implications of this complaint:

> 20. To the extent that the District of Columbia and/or its Metropolitan Police Department are governed by the Federal Government, this Court also has jurisdiction under 28 U.S.C. § 2680(h). 21. Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2), (3) because the Plaintiff resides in and is a citizen in this judicial district and The Defendants are subject to personal jurisdiction in this District.

Taake's complaint, ECF 2-1, at 5.


By contrast the Middle District of Pennsylvania has no personal jurisdiction

over these entities.


Indeed, Taake's claim of medical maltreatment, neglect and injury plainly

begins in the District of Columbia:

56. Due to the unlawful conduct of The Defendants, Taake suffered a three-and-a-half year prison horror story. While wrongly imprisoned over the January 6 events, Taake sought medical attention but was denied, delayed, and knowingly misdiagnosed and mistreated.

57. Due to a longstanding medical hormonal imbalance, Taake needed medical testosterone treatments every seven days. But *Medical staff within the D.C. jail and the Bureau of Prisons were openly hostile and deliberately indifferent to Taake's medical needs.* Taake contracted and tested positive for tuberculosis, but medical staff provided no treatment.

Taake's corrected complaint, ECF 2-1, at 13-14.

Indeed it is not until paragraph 58 of Taake's complaint that "Lewisberg, PA" is mentioned:

58. Taake was taken to the prison at Lewisberg, PA around October 21, 2021. Medical staff at U.S.P. Lewisberg openly mocked Taake, and callously ignored Taake.

Taake's corrected complaint, ECF 2-1, at 14.

Indeed, only about 5 paragraphs (and a single page) of Taake's 30-page corrected complaint specifically involve events at the Lewisberg prison. The conduct of Dr. Edinger, a physician at Lewisberg, is mentioned in some 8 additional paragraphs between pages 15 and 17 of Taake's corrected complaint.

But the Lewisberg facility is hardly alone. Taake's medical, mistreatment, neglect and isolation horror story occurs within the Bureau of Prisons generally. Taake's complaint makes clear that "more than a dozen different facilities" were involved in causing Taake's injuries:

65. This caused Taake to be harassed, stalked and assaulted by inmates within the prison system.

66. At the prison in Beaumont, Texas, Taake was beaten by multiple prisoners and forced into the yard. He suffered broken teeth, massive swelling and a broken nose.

67. Wrongly identified by BOP staff as a problematic inmate, Taake was *transferred to more than a dozen different facilities.*

68. At most prisons, Taake was placed in solitary confinement as punishment. Taake suffered three prison attacks when fellow prisoners came into his cell and attacked him. His hand was broken more severely due to fights over breast growth.

69. While incarcerated, Peters' BOP tormented Taake by staging shakedowns of his cells, during which BOP staff overseen by Peters would wrongly seize Taake's legal and medical papers and records and destroy them.

Taake's corrected complaint, ECF 2-1, at 14-15 (emphasis added).

The weight of the private interest factors favors this District. The claims arose here: the false statements by the MPD police officer (Nathan Tate), due process violations in arrest and prosecution, and other misconduct that precipitated Plaintiff's imprisonment all occurred in the District of Columbia. These are the foundational acts without which the subsequent incarceration—and any medical neglect therein—would not have happened. Courts routinely deny transfer where the "heart" of the case is in the original forum, even if some events occurred elsewhere. *See, e.g., Nat'l Wildlife Fed'n v. Harvey*, 355 F. Supp. 2d 49, 53 (D.D.C. 2005) (denying transfer where core decisions were made in D.C., despite some impacts in another district).

Defendant's focus on the USP Lewisburg allegations elevates a secondary aspect of the complaint. The medical neglect claims are derivative of the primary D.C.-based violations, representing harms suffered as a result of the wrongful imprisonment initiated in this jurisdiction. Transferring the case would improperly fragment the litigation and disregard the interconnected nature of the claims.

### B. Convenience of Parties and Witnesses Weighs Against Transfer.

Plaintiff chose this forum, and that choice should be respected. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56 (1981). Many key witnesses, including officer Tate and other personnel involved in the arrest, prosecution, sentencing and imprisonment are located in or near the District of Columbia. Evidence such as police reports, court records, and other documentation from the initial events is also centered here. While some witnesses related to the medical neglect (e.g., USP Lewisburg staff) may be in Pennsylvania, modern litigation tools like video depositions and electronic discovery mitigate any inconvenience. See Heller Fin., Inc. v. Riverdale Auto Parts, Inc., 713 F. Supp. 1125, 1130 (N.D. Ill. 1989) (noting that witness travel is less burdensome in the era of advanced technology). Transfer would merely shift inconvenience to Plaintiff and D.C.-based witnesses without a compelling net benefit.

### C. The Interests of Justice Favor Retaining Venue in This District.

Public interest factors also support denial. This Court is familiar with federal constitutional claims, including those under the Fifth and Eighth Amendments, and has a strong local interest in adjudicating allegations of misconduct by D.C. law enforcement. See Greater Yellowstone Coal. v. Bosworth, 180 F. Supp. 2d 124, 129 (D.D.C. 2001) (local interest in deciding controversies at home). The Middle District of Pennsylvania, while competent, lacks the same direct connection to the core allegations. Court congestion does not favor transfer; both districts handle similar caseloads, and this case's ties to D.C. make it more efficient to litigate here. Granting transfer would encourage forum-shopping by defendants seeking to avoid accountability in the district where the primary wrongdoing occurred.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. In the alternative, Plaintiff requests leave to file an Amended Complaint to address any deficiencies. The Defendants' efforts to remove or transfer this case (or any part of this case) to the Middle District of Pennsylvania should also be denied.

Dated: April 3, 2026                              Respectfully submitted,

                                                  /s/ Roger Roots, Esquire
                                                  Peter Ticktin, Esquire
                                                  Ticktin Law Group
                                                  270 SW Natura Avenue

Deerfield Beach, Florida 33441
Serv606@LegalBrains.com
Serv514@LegalBrains.com
Telephone: 561-232-2222
Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, I electronically filed the PLAINTIFF TAAKE'S MEMORANDUM OF LAW IN SUPPORT OF HIS RESPONSE AND OPPOSITION TO THE UNITED STATES' COMBINED MOTION FOR PARTIAL DISMISSAL AND TRANSFER OF VENUE with the Clerk of the Court and all counsel of record by using the CM/ECF system, which will send a notice of electronic filing to opposing counsel registered on CM/ECF.


  /s/   Roger Roots